JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
ELI A. ALCARAZ (Cal. Bar No. 288594)
MICHAEL J. MORSE (Cal. Bar No. 291763)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
        312 North Spring Street, Floor 15
        Los Angeles, California 90012
        Telephone: (213) 894-3424/7367/3819
        Facsimile: (213) 894-6269
        Email:    Eli.Alcaraz@usdoj.gov
                  Michael.Morse@usdoj.gov
                  Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 24-527-SVW |
| Plaintiff, | UNITED STATES' TRIAL MEMORANDUM |
| v. | Trial Date:  February 4, 2025 |
| TREVOR JAMES KIRK, | Trial Time:  9:00 a.m. |
| Defendant. | Location:   Ctrm. of the Hon. Stephen V. Wilson |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Eli A. Alcaraz, Michael J. Morse, and Brian R. Faerstein hereby files its Trial Memorandum for the trial of defendant Trevor James Kirk.

///

///

1      The United States respectfully requests the opportunity to

2  submit additional trial memoranda before trial or during trial as the

3  need may arise.

4   Dated: January 29, 2025           Respectfully submitted,

5                                     JOSEPH T. MCNALLY
                                      Acting United States Attorney
6
                                      LINDSEY GREER DOTSON
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                      /s/
                                      ELI A. ALCARAZ
10                                    MICHAEL J. MORSE
                                      BRIAN R. FAERSTEIN
11                                    Assistant United States Attorneys

12                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.....................ii**Error! Bookmark not defined.**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................1

      A.    Background of Defendant...............................1

      B.    Call for Service at WinCo in June 2023................2

      C.    Defendant and Alejandre Detain D.B. Without Incident......3

      D.    Defendant's Use of Excessive Force Against J.H...........4

      E.    Aftermath of Defendant's Use of Excessive Force...........6

      F.    Defendant Authors a Misleading Incident Report...........7

III.  CHARGE AND ELEMENTS........................................8

IV.   STATUS OF THE CASE.........................................9

      A.    The United States' Case-in-Chief.......................9

      B.    The Defense Case....................................12

      C.    Stipulations.......................................12

      D.    Motion in Limine...................................14

      E.    Jury Instructions..................................14

V.    LEGAL AND EVIDENTIARY ISSUES..............................15

      A.    Authentication and Foundation.........................15

      B.    Lay Opinion by Law Enforcement Officers................15

      C.    Hearsay Generally and Admissions of Party Opponent......18

      D.    Exceptions to the Hearsay Rule........................20

      E.    Written Transcripts of Audio/Video Recordings..........24

      F.    Expert Testimony...................................24

      G.    Summary Exhibits..................................26

      H.    Cross Examination of Defendant.......................27

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                              PAGE

     I.   Use of Defendant's Proffer Statements....................27

     J.   Inadmissibility of Specific Prior Good Acts of Defendant and Other Issues Regarding Character Evidence................................................29

     K.   Not Calling Specific Witnesses at Trial.................31

     L.   Nullification..........................................33

VI.  CONCLUSION..................................................33

1

**TABLE OF AUTHORITIES**

2

<u>Page(s)</u>

3

**<u>Federal Cases</u>**

4

<u>Avery Dennison Corp. v. Four Pillars Enter. Co.,</u>

5
  45 Fed. Appx. 479 (6th Cir. 2002) ................................. 17

6

<u>Goldberg v. United States,</u>

7
  789 F.2d 1341 (9th Cir. 1986) .................................... 27

8

<u>In re Sealed Case,</u>
  352 F.3d 409 (D.C. Cir. 2003) .................................... 30

9

<u>Michelson v. United States,</u>

10
  335 U.S. 469 (1948) ............................................. 31

11

<u>Mukhtar v. California State University, Hayward,</u>

12
  299 F.3d 1053 (9th Cir. 2002) .................................... 18

13

<u>Ohio v. Roberts,</u>
  448 U.S. 56 (1980) .............................................. 23

14

<u>People of Territory of Guam v. Ignacio,</u>

15
  10 F.3d 608 (9th Cir. 1993) .................................. 21, 22

16

<u>United States v. Arteaga,</u>

17
  117 F.3d 388 (9th Cir. 1997) ..................................... 18

18

<u>United States v. Aubrey,</u>
  800 F.3d 1115 (9th Cir. 2015) .................................... 26

19

<u>United States v. Bagley,</u>

20
  722 F.2d 482 (9th Cir. 1985) ..................................... 32

21

<u>United States v. Barragan,</u>

22
  871 F.3d 689 (9th Cir. 2017) ..................................... 16

23

<u>United States v. Barrow,</u>
  400 F.3d 109 (2d Cir. 2005) ...................................... 28

24

25

<u>United States v. Black,</u>
  767 F.2d 1334 (9th Cir. 1985) .................................... 27

26

<u>United States v. Bush,</u>

27
  58 F.3d 482 (9th Cir. 1995) ...................................... 31

28

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                              PAGE

United States v. Cabrera,
    201 F.3d 1243 (9th Cir. 2000) ..................................... 32

United States v. Castillo,
    866 F.2d 1071 (9th Cir. 1988) ..................................... 32

United States v. Childs,
    5 F.3d 1328 (9th Cir. 1993) ....................................... 23

United States v. Chu Kong Yin,
    935 F.2d 990 (9th Cir. 1991) ...................................... 15

United States v. Chui,
    109 F.3d 624 (9th Cir. 1997) ...................................... 28

United States v. Collicott,
    92 F.3d 973 (9th Cir. 1996) ....................................... 20

United States v. Crosgrove,
    637 F.3d 646 (6th Cir. 2011) ...................................... 20

United States v. Dhinsa,
    243 F.3d 635 (2d Cir. 2001) ....................................... 15

United States v. Diaz,
    961 F.2d 1417 (9th Cir. 1992) ..................................... 30

United States v. Dorsey,
    122 F.4th 850 (9th Cir. 2024) ................................. 16, 17

United States v. Echeverry,
    759 F.2d 1451 (9th Cir. 1985) ..................................... 18

United States v. Falsia,
    724 F.2d 1339 (9th Cir. 1983) ..................................... 33

United States v. Fernandez,
    839 F.2d 639 (9th Cir. 1988) ...................................... 19

United States v. Fleishman,
    684 F.2d 1329 (9th Cir. 1982) ..................................... 32

United States v. Gibson,
    690 F.2d 697 (9th Cir. 1982) ...................................... 18

1

**TABLE OF CONTENTS (CONTINUED)**

2

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

3

<u>United States v. Hedgcorth</u>,
4     873 F.2d 1307 (9th Cir. 1989) .................................. 31

5     <u>United States v. Holguin</u>,
      51 F.4th 841 (9th Cir. 2022) ............................... 16, 25
6

7     <u>United States v. Johnson</u>,
      594 F.2d 1253 (9th Cir. 1979) .................................. 26
8

      <u>United States v. Krilich</u>,
9     159 F.3d 1020 (9th Cir. 1998) .................................. 29

10    <u>United States v. Miranda-Uriarte</u>,
      649 F.2d 1345 (9th Cir. 1981) .................................. 27
11

12    <u>United States v. Noushfar</u>,
      78 F.3d 1442 (9th Cir. 1996) ................................... 24
13

14    <u>United States v. Ortega</u>,
      203 F.3d 675 (9th Cir. 2000) ............................... 19, 20
15

16    <u>United States v. Pang</u>,
      362 F.3d 1187 (9th Cir. 2004) .................................. 15

17    <u>United States v. Petrosian</u>,
      661 F. App'x 903 (9th Cir. 2016) .............................. 29
18

19    <u>United States v. Powell</u>,
      955 F.2d 1206 (9th Cir. 1992) .................................. 33
20

21    <u>United States v. Ray</u>,
      930 F.2d 1368 (9th Cir. 1990) .................................. 23
22

      <u>United States v. Rebbe</u>,
23    314 F.3d 402 (9th Cir. 2002) ............................... 28, 29

24    <u>United States v. Reyes</u>,
      966 F.2d 508 (9th Cir. 1992) ................................... 32
25

26    <u>United States v. Rizk</u>,
      660 F.3d 1125 (9th Cir. 2011) .................................. 26
27

      <u>United States v. Scales</u>,
28    594 F.2d 558 (6th Cir. 1979) ............................... 26, 27

## <u>TABLE OF CONTENTS (CONTINUED)</u>

<u>DESCRIPTION</u>                                                                                                              <u>PAGE</u>

<u>United States v. Soulard</u>,
    730 F.2d 1292 (9th Cir. 1984) .................................... 27

<u>United States v. Turner</u>,
    528 F.2d 143 (9th Cir. 1975) ..................................... 24

<u>United States v. Valerio</u>,
    441 F.3d 837 (9th Cir. 2006) ..................................... 18

<u>United States v. Vallejos</u>,
    742 F.3d 902 (9th Cir. 2014) ..................................... 20

<u>United States v. Weber</u>,
    No. CR 21-28-M-DLC, 2022 WL 2463039 (D. Mont. July 6, 2022) ...... 30

<u>United States v. Williams</u>,
    990 F.2d 507 (9th Cir. 1993) ..................................... 32

<u>Wagner v. County of Maricopa</u>,
    747 F.3d 1048 (9th Cir. 2013) .................................... 22

<u>Zal v. Steppe</u>,
    968 F.2d 924 (9th Cir. 1992) ..................................... 33

**Federal Statutes**

18 U.S.C. § 242............................................... 1, 8

**Federal Rules**

Federal Rule of Criminal Procedure 16(a)(1)(G)..................... 25
Fed. R. Evid. 106................................................. 20
Fed. R. Evid. 404(a)(2)(A)........................................ 30
Fed. R. Evid. 405(a).............................................. 31
Fed. R. Evid. 611(b).............................................. 27
Fed. R. Evid. 701................................................. 16
Fed. R. Evid. 801(c)........................................... 18, 19
Fed. R. Evid. 803(1)......................................... passim
Fed. R. Evid. 901(a).............................................. 15
Fed. R. Evid. 902................................................. 15

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On the early afternoon of Saturday, June 24, 2023, defendant Trevor James Kirk ("defendant"), a sworn Los Angeles County Sheriff's Department ("LASD") deputy, used excessive force against victim J.H. when he responded to a "call for service" at a WinCo Foods grocery store ("WinCo") in Lancaster, California.  Upon encountering J.H., who was using a cell phone to record defendant's and his partner's detention of J.H.'s companion in the WinCo parking lot, defendant used more force than reasonably necessary when he assaulted J.H. by body-slamming her to the ground face-first and using a dangerous weapon (pepper spray) multiple times against J.H.--all causing bodily injury and extreme physical pain to J.H.  In so doing, defendant violated J.H.'s Fourth Amendment right to be free from unreasonable and excessive force by a law enforcement officer.  For his misconduct, defendant is charged with one felony count of Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242.

## II.    STATEMENT OF FACTS

### A.    Background of Defendant

Defendant was hired as an LASD deputy in August 2019, and was in deputy training until January 2020.  From January 2020 until February 2022, defendant was assigned to Men's Central Jail in Los Angeles. Defendant was reassigned to patrol duty at the LASD's Lancaster Station as of March 2022, at which time he began serving as a full-time, sworn peace officer.

Defendant received substantial law enforcement training and instruction from the inception of his time at LASD through the June 2023 incident at issue in this case.  Training records provided by

LASD and the California Commission on Peace Officer Standards and Training ("POST") reflect defendant completed at least 60 different trainings or courses on a broad range of topics.  These trainings included a POST-certified 800-hour Basic Course-Intensive and 120-hour Advanced Officer Course, both of which included instruction on the use of force by law enforcement and de-escalation techniques. Defendant also completed courses in, among other things, Strategic Communications, Constitutional Policing, Critical Decision Making, and De-Escalation and Verbal Resolution during his time at LASD.

In addition, LASD maintains policies and procedures, set forth in the LASD's Manual of Policies and Procedures (the "MPP"), governing the discharge of deputies' duties as peace officers.[1]  The MPP includes a volume on Policy and Ethics, which all LASD employees are responsible for reviewing and understanding.  The Policy and Ethics volume in turn includes a chapter on the LASD's Force Policy, which provides guidance and instruction on de-escalation, force reduction principles, unreasonable force, and retaliatory force.  On April 15, 2020, defendant signed an acknowledgment that he had reviewed and understood the LASD's Use of Force policy within the MPP, certifying that he understood that he had "a duty to comply fully with the Policy and Procedures, and conduct [him]self consistent with [the LASD's] Core Values."

**B.    Call for Service at WinCo in June 2023**

On June 24, 2023, at approximately 12:16 p.m., LASD dispatch sent out a call for service to the Lancaster WinCo Foods grocery store based on two 911 calls received from employees at the store.

---

[1] See https://pars.lasd.org/Viewer/Manuals/10008?returnContent ID=10009#pagePosition_0.

2

1  Defendant and his partner on duty that day, LASD Deputy Felipe

2  Alejandre, Jr. ("Alejandre"), responded to the call.

3      The call for service concerned two customers at the WinCo, J.H.

4  and D.B., whose identities were then unknown to law enforcement and

5  the WinCo employees who called 911.  WinCo employees accused D.B. and

6  J.H. of failing to scan certain items at a self-checkout, which led

7  to a confrontational exchange between D.B. and J.H. and WinCo loss

8  prevention employees.  During this exchange, J.H. claimed a WinCo

9  loss prevention employee intentionally bumped into J.H.  In response,

10  J.H. spit at an employee's face.  WinCo employees eventually escorted

11  J.H. and D.B. out of the WinCo, but only after issuing them a refund

12  for the items they had scanned and paid for.  When J.H. and D.B. left

13  the store, they did not take any of the items they had scanned,

14  attempted to scan, or had been accused of failing to scan.

15      LASD dispatch called for deputies to respond to a "211 now," in

16  reference to the California Penal Code Section for Robbery.  The

17  information provided by dispatch further said that two people were

18  inside the WinCo fighting with loss prevention.  Dispatch gave

19  descriptions of D.B. and J.H., including their appearance and

20  clothing type, and that they were getting into a black Toyota in the

21  parking lot.  The descriptors generally matched D.B., then 56 years

22  old, and J.H., who was 58.

23      **C.  Defendant and Alejandre Detain D.B. Without Incident**

24      Alejandre arrived at the WinCo first, but did not physically

25  engage D.B. until defendant arrived approximately one minute later.

26  Both defendant and Alejandre wore body worn cameras, which were

27  activated at the time of the initial encounters with D.B. and J.H.

28  Alejandre first issued commands to D.B. at a distance, as Alejandre

stood next to the driver's side door of his patrol vehicle.  D.B. did not immediately follow Alejandre's commands to get on the ground, put his hands on the hood of Alejandre's car, or sit down.

As Alejandre approached D.B., Alejandre said, "What's going on, dude?"  Simultaneously, defendant approached D.B., calmly put his left hand on D.B.'s left wrist, and said, "We're just going to pat you down, buddy . . . Big dog."  During his detention, D.B. verbally protested ("Boss, why are y'all doing all this?  That man was threatening me, man!"), but defendant and Alejandre successfully de-escalated the situation (e.g., "You're not under arrest, you're being detained") and were able to handcuff and detain D.B. without further incident.  During the detention of D.B., defendant used de-escalation tactics, as he was trained to do, and generally explained what he was doing to D.B.

**D.    Defendant's Use of Excessive Force Against J.H.**

While D.B. was being detained, J.H. walked over to defendant and Alejandre and began filming the detention of D.B. with her cell phone, telling both deputies they had a legal obligation to inform D.B. why he was being detained.  After D.B. was handcuffed, defendant asked Alejandre where the other suspect was.  Alejandre pointed to J.H., who was standing approximately 8-10 feet away from the two deputies, filming their detention of D.B.

Without giving any commands--as both Alejandre and defendant had given to D.B. seconds earlier--defendant walked over to J.H. and reached with both his hands toward J.H.'s phone, which was in her left hand.  After J.H. pulled her phone away and turned slightly away from defendant, defendant grabbed J.H.'s right bicep with his left hand.  J.H. pulled her arm away while, in the same motion, seemingly

4

attempting to swat defendant's hold away.  As she did that, J.H. said, "No, you can't touch me!"  Defendant then grabbed J.H.'s right arm with both hands and said, "Stop."  J.H. again said, "You can't touch me!"  Defendant once again said, "Stop," but did not provide any further instruction or direction to J.H., as he grabbed her with both hands and pushed her a couple of feet toward Alejandre's car.

Defendant then grabbed J.H. behind her neck with his left arm while continuing to clutch J.H.'s right arm with his right hand. Defendant violently threw J.H. to the ground, face-first.  J.H. screamed as defendant effectively body-slammed her to the concrete.[2]

After J.H. hit the ground, defendant stood over and then got on top of J.H.'s body.  Defendant raised his right arm, closed his fist, aimed it in the direction of J.H.'s head, and threatened to punch her in the face ("Stop, or you're gonna get punched in the face!"). Then, using his right hand, defendant radioed dispatch, reporting that he was "in a fight" at the WinCo.  J.H. responded, "I can't breathe!  It's no fight!  You threw me down to the ground!  Stop manhandling me!  I didn't do nothing!"  Without any intervening commands, approximately eight seconds after calling in the fight, defendant twice sprayed J.H. in the face with pepper spray.

After the first pepper spray, J.H. reacted by moving her face away from the spray and screamed in pain.  Defendant then sprayed her again, while J.H. twice screamed out, "Call the commander!" Defendant pulled J.H.'s right arm behind her back and said, "Hands

---

[2] In its opposition to defendant's  motion in limine to exclude statements (Dkt. 31), the United States included screenshots of defendant's violent take-down of J.H. that were obtained from a bystander witness's cell phone recording of the incident.  (See Dkt. 31 at p. 12 (all references to pagination herein reflect page numbers in the ECF banner at the top of the page).)

behind your back." J.H. again said, "Call the commander," and "Stop twisting my arm." In response, defendant yelled "Put your hands behind your back!" J.H. screamed, "I can't"--indeed one of her hands was pinned beneath her body while defendant straddled her back with his body weight and his knee pressed against J.H.'s shoulder blade.

J.H. whimpered, "Call the commander" several more times. Defendant ordered her to "Stop" and she responded, "I'm not doing anything." Defendant handcuffed her right hand and tried to get control of J.H.'s left hand, which was still under her torso. He said, "Give me your [left] hand" twice, to which she responded, "I've got my prescription glasses," which she was clutching in her left hand. Defendant responded, "I don't care." J.H. said "I had eye surgery." Defendant then ordered her to "Put your hand behind your back" and yelled "You're going to get sprayed again!" Defendant grabbed her prescription glasses and tossed them out of reach before handcuffing J.H.'s left wrist.

When defendant ultimately handcuffed J.H. and walked her to his patrol vehicle, J.H. told defendant, "I didn't do anything! You were mad because I videoed and put it on YouTube." Defendant responded, "I'm mad because you're not listening."

### E.    Aftermath of Defendant's Use of Excessive Force

As a result of the pepper spray, J.H. experienced extreme physical pain, substantial difficulty breathing, and swollen eyes. And as a result of defendant's violent takedown, J.H. sustained scrapes, bruises, blunt force injury to her head, and other injuries. Body worn camera footage from defendant, Alejandre, and several other responding LASD officers captured J.H. in various states of pain and

suffering, both in the WinCo parking lot and at a hospital where she was treated for her injuries later in the day.

Despite having twice sprayed J.H. with pepper spray and observing the evident pain she suffered as a result, defendant detained J.H. in the back of his patrol vehicle with the rear doors and windows closed in the dead of summer for approximately ten minutes, even after J.H. told defendant she had asthma and trouble breathing.  When J.H. ultimately was transferred to another patrol vehicle by a different LASD deputy, she begged for additional fresh air while she spit profusely, could not open her eyes, and complained of having trouble breathing because of asthma.  (Deputies found an asthma inhaler in J.H.'s purse in J.H.'s and D.B.'s car on scene.) And when J.H. informed a responding LASD sergeant that defendant had thrown her to the ground, defendant could be seen in body worn camera footage turning away from J.H. and smirking in jest.

Following her examination at the hospital, J.H. was diagnosed with the following: "1. Blunt head injury; 2. Scalp contusion; 3. Contusion of right forearm; 4. Contusion of right wrist; 5. Chemical conjunctivitis; 6. Contact dermatitis; 7. Closed fracture of scaphoid of right wrist."

**F.    Defendant Authors a Misleading Incident Report**

Several hours after the use of force incident, defendant drafted and submitted a report containing several misleading statements. Among other things, defendant misleadingly claimed that J.H. assaulted him, attempted to hit him, and took a "fighting" or "blading" stance--none of which was accurate.  Defendant submitted this report after having reviewed his own body worn camera, which did not reflect in any meaningful way the circumstances of his takedown

7

of J.H. or his multiple deployments of pepper spray against her. However, at the time defendant submitted his report, he did not know that another bystander witness had used a cell phone to record defendant's takedown of J.H. and a WinCo surveillance camera similarly had captured his use of excessive force.

**III.  CHARGE AND ELEMENTS**

The Indictment charges defendant with one felony count of Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242.  As set forth in the parties' joint proposed jury instructions (discussed further below), the parties agree the following elements apply to this offense:

(1)  J.H. was in the State of California;

(2)  Defendant there deprived J.H. of a right which is secured or protected by the Constitution or laws of the United States-- in this case, J.H.'s right to be free from the use of unreasonable or excessive force;

(3)  Defendant acted under the color of law when depriving J.H. of a constitutional right; and

(4)  Defendant acted willfully to deprive J.H. of such right.

If the jury finds the foregoing four elements, it will then be required to determine if (1) J.H. suffered bodily injury as a result of defendant's conduct, or (2) defendant used a dangerous weapon in committing the offense.  If the jury finds that J.H. suffered bodily injury or that defendant used a dangerous weapon (or both), defendant's crime is a felony.  If the jury finds that J.H. did not suffer bodily injury and that defendant did not use a dangerous weapon, defendant's crime is a misdemeanor.

## IV.  STATUS OF THE CASE

Jury trial is scheduled to commence on Tuesday, February 4, 2025, at 9:30 a.m.  Defendant is released on bond pending trial.

### A.  The United States' Case-in-Chief

The United States anticipates that its case-in-chief will take approximately two to three days, depending on whether the parties can reach additional stipulations, such as concerning the admissibility of exhibits.  At present, the United States intends to call six to eight witnesses, to testify as part of its case-in-chief: FBI Special Agent Victoria Brown, the case agent for the underlying investigation who will testify about defendant's background and part of the investigation, videos that were synced by the FBI (the United States will seek to admit composite exhibits showing simultaneous displays of defendant's body worn camera and the bystander video as well as defendant's body worn camera and surveillance footage), evidence of J.H.'s bodily injury and the effects of pepper spray on her, and documents and training materials she received relevant to defendant's willfulness; L.H., a bystander witness who recorded the detention of D.B. and the use of force against J.H. on a cell phone from L.H.'s vehicle in the WinCo parking lot; a doctor from the Antelope Valley Medical Center who examined J.H. several hours after the use of force incident; one or two LASD employees who will testify about relevant LASD policies, procedures, and training that defendant received, including with respect to use of force and de-escalation; and Roger Clark, a Police Procedures Consultant who will offer expert testimony regarding, among other things, defendant's failure to investigate or attempt to de-escalate and the inconsistency of defendant's use of force with the requirements and standards set forth in LASD policy

and POST training.[3]  The United States is also considering calling J.H. and Alejandre.

The majority of the United States' evidence for its case-in-chief will fall into the following categories of information:

***Body worn camera ("BWC") footage from LASD personnel:***  The United States will offer clips of video recordings (almost all with audio for some portion) from BWCs worn by defendant, his partner Alejandre, and several other LASD officers who responded to the scene.  The BWC footage captures from multiple perspectives the lead-up to the use of force incident, the incident itself, and the aftermath of the incident.  The United States understands from its meet-and-confers with the defense that defendant does not contest the authenticity or foundation for these BWC exhibits, but may raise certain objections based on relevance or Rule 403 grounds and seek to admit other portions of clips.

***Other video and audio recordings and clips:***  Defendant's use of excessive force against J.H. also was captured from distinct angles in a separate recording made by bystander L.H., a recording taken by J.H. on her own cell phone as defendant approached her, and a WinCo surveillance camera looking down on the parking lot.  The recordings from the BWCs and these other sources do not independently capture all pertinent aspects of the incident, and thus the combination of these vantage points is critical for presenting a full picture to the jury.  The United States also may offer additional WinCo surveillance footage reflecting relevant aspects of the aftermath of the use of

---

[3] Mr. Clark previously worked in numerous roles at LASD for over 27 years, from an entry-level deputy all the way up to lieutenant of several specialized units and bureaus.

force incident and LASD dispatch recordings of the call for service
and relevant communications between LASD personnel.  The United
States understands from its meet-and-confers with the defense that
defendant does not have any foundation or authentication objections
to these videos and that the defense will stipulate to the admission
of J.H.'s and L.H.'s videos.

**_Training records and LASD policies/procedures:_**  The United
States intends to offer LASD and POST records reflecting the training
and instruction defendant received since joining LASD, as most
relevant to the events and issues in this case.  The United States
also understands from its meet-and-confers with the defense that
defendant does not object to the admissibility of the records
reflecting the trainings he has received.  In addition, the United
States intends to offer relevant LASD policies and procedures that
were in effect the day of the incident bearing on the events and
issues in this case, including materials from the LASD's Manual of
Policy and Procedures (which is a publicly-available set of documents
on the LASD's website).

**_LASD records and personnel file materials:_**  The United States
intends to offer certain other materials obtained from LASD and
defendant's personnel file, including defendant's acknowledgement of
receiving and reviewing the LASD use of force policy, defendant's
shift calendars for the relevant period, and other internal records
regarding the June 24, 2023 incident at the WinCo.  The United States
also understands from its meet-and-confers with the defense that
defendant does not object to the admissibility of these documents.

**_Medical records:_**  The United States intends to offer medical
records obtained for J.H.'s visit and treatment at the Antelope

11

Valley Medical Center on June 24, 2023, in the hours following the use of force incident at the WinCo.  The United States has produced to the defense a Rule 902(11) declaration for these records and on January 10, 2024, the portion of the records it seeks to admit.  As of the filing of this memorandum defendant has not raised any objection to the proposed records.

**Photographs, screenshots, and maps:**  The United States also will be offering photographs of the WinCo parking lot, screenshots from some of the video footage described above, and maps of the location of the WinCo obtained from Google.

**Summary chart:**  The United States also intends to offer at least one summary exhibit under Rule 1006 setting forth a timeline of relevant events compiled from the voluminous BWC and other audio/video evidence.  The United States is finalizing this summary chart and will provide a copy to the defense for its review as soon as practicable.

**B.    The Defense Case**

To date, the defense has provided the United States notice that it may call one or more of the following witnesses: Lorenzo Glenn (a purported expert in police procedures); Deputy Alejandre; Sgt. Andrew Stowers (the responding sergeant to the incident at WinCo); Mario M. Villalobos (who purportedly provided training to defendant); and defendant.

**C.    Stipulations**

The parties thus far have entered into and filed three trial stipulations with the Court as follows:

1.    Trial Stipulations Concerning Factual Issues (Dkt. 26), in which the parties stipulate to certain facts regarding: the LASD's

12

jurisdiction and defendant's and Alejandre's respective status as sworn LASD deputies; the WinCo Foods grocery store, J.H., and D.B.; the background of the LASD's call for service on June 24, 2023, including alleged events within the WinCo; and issues relating to the offense of "Robbery" under California Penal Code Section 211.  With respect to the stipulated facts about the reason for the call for service, the parties have agreed that the alleged events inside of WinCo that preceded defendant's use of force are not relevant, and therefore will not seek to introduce any evidence about what took place inside the WinCo to avoid wasting time or a mini-trial -- especially because, aside from what is in the stipulation, defendant was not aware of what allegedly took place inside WinCo at the time of his encounter with D.B. and J.H.

2.    Trial Stipulations Concerning Factual Issues Number Two (Dkt. 27), in which the parties stipulate to certain facts regarding a prior use of force incident involving defendant in June 2022 that led to the LASD recommending, on May 31, 2023, that the Lancaster station needed a station-wide briefing focusing on de-escalation and staging medical resources, just over three weeks before the use of force incident outside the WinCo on June 24, 2023.

3.    Trial Stipulations Concerning Legal Issues (Dkt. 28), in which the parties stipulate that defendant was acting under "color of law" during the events outside the WinCo, J.H. was in the State of California at the time, and excessive force by a law enforcement officer during an arrest, investigatory stop, or other seizure of a person constitutes an unreasonable seizure under the Fourth Amendment.

1

   **D.   Motion in Limine**

2       The parties filed an omnibus brief on defendant's motion <u>in</u>

3 <u>limine</u> to exclude statements captured on a recording made by a

4 bystander (L.H.) feet from where defendant used excessive force

5 against J.H.  The parties' respective positions are set forth in the

6 omnibus brief.  At the January 27, 2024 pretrial conference, the

7 Court ruled that the portions of the video where L.H. can be heard

8 should be modified so that her statements are not presented to the

9 jury.

10      The parties have are continuing the met-and-confer process to

11 reach agreements multiple other potential evidentiary and legal

12 issues to obviate the need to raise other issues for the Court's

13 adjudication.

14    **E.   Jury Instructions**

15      As previously noted, the parties have filed joint proposed jury

16 instructions in which the parties, at present, agree on virtually all

17 the proposed instructions, including the two substantive instructions

18 pertaining to the charged offense.  (<u>See</u> Dkt. 32 at 42-48 (Joint

19 Proposed Instruction Nos. 31 and 32).)

20       There are only two areas of potential dispute, which the

21 parties flagged in bracketed language in Joint Proposed Instruction

22 No. 31 in their joint filing.  (<u>Id.</u> at 43:13-17.)  Specifically, the

23 two sentences that may be in dispute, which both pertain to the

24 jury's determination of whether defendant's force against J.H. was

25 objectively reasonable, are as follows:  "This analysis is not

26 static, an officer must reassess use of force in an evolving

27 situation as the circumstances change.  Force used to retaliate or

28 punish that has no legitimate law enforcement purpose constitutes

14

unreasonable or excessive force."  (Id.)  As noted in the joint filing, the parties will further address the applicability of one or both of these sentences if necessary based on how the evidence comes in at trial.

## V.    LEGAL AND EVIDENTIARY ISSUES

### A.    Authentication and Foundation

Rule 901(a) simply requires that a proponent of evidence make a prima facie showing of authenticity so that a reasonable juror could find "that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  This requirement "does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  United States v. Dhinsa, 243 F.3d 635, 658-59 (2d Cir. 2001) (citations omitted).  The proponent of evidence need not establish a proper foundation through personal knowledge; a proper foundation "can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902."  United States v. Pang, 362 F.3d 1187, 1193 (9th Cir. 2004) (citation omitted).  The United States need make only a prima facie showing of authenticity.  See United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991).

As previously noted, the parties have reached agreements on authenticity and foundation for all the exhibits discussed above.

### B.    Lay Opinion by Law Enforcement Officers

Pursuant to Federal Rule of Evidence 701, testimony in the form of a lay opinion is only admissible where the testimony is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a

15

fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Provided their opinions meet the requirements of Rule 701, law enforcement officers involved in the investigation, including FBI Special Agent Victoria Brown who was the lead case agent in the underlying investigation of this case, may offer lay opinions about, for example, the meaning of words in audio/video recordings such as the BWC footage. United States v. Holguin, 51 F.4th 841, 865 n.18 (9th Cir. 2022). As the Ninth Circuit has explained, "the line between lay and expert opinion depends on the basis of the opinion, not its subject matter." United States v. Barragan, 871 F.3d 689, 704 (9th Cir. 2017). Provided any opinions offered by Special Agent Brown are supported by her investigative activities and direct knowledge of the investigation, her lay opinions are admissible. Holguin, 51 F.4th at 864-866.

Particularly relevant here, where there is body worn camera and surveillance footage from multiple angles and other cell phone videos, all of which concerns events that take place in a short period of time, the Ninth Circuit explicitly held recently that agents are permitted to offer lay opinion of small details in recordings that they were able to discern through repeatedly watching the videos. See generally United States v. Dorsey, 122 F.4th 850 (9th Cir. 2024). At the trial in Dorsey, the "evidence at trial included video from security cameras that recorded the [charged] robberies," and "[b]ased on his review, [a] detective opined on details in the video that the jury may otherwise have missed." Id. at 853. Specifically, "he opined about details that the jury might have missed, such as the markings on the robbers' shoes." Id. at

16

854.  "These opinions were grounded in the video itself and the detective's thorough out-of-court review of that video."  Id.  The Dorsey court explained that "[w]hen a law enforcement officer points out particulars in a video that are based on a close and repeated out-of-court review and that a casual observer would likely miss, the testimony is lay opinion because the officer is contributing to the jury's in-court perception of the video."  Id. at 855.  The Ninth Circuit held that "[s]uch lay opinion is admissible because a juror, without the benefit of the officer's thorough review, might overlook the details highlighted by the officer's testimony" and therefore, "the officer's out-of-court review of the video adds value beyond simply playing the video to the jury and may be helpful to determine a fact at issue."  Id. (internal quotation omitted).  Agent Brown has poured over the videos in this case and the United States plans to elicit testimony about important details that might be missed from a single viewing of an exhibit.

However, concerning the requirement that the testimony not be based "on scientific, technical, or other specialized knowledge within the scope of Rule 702," Rule 701 seeks to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."  Avery Dennison Corp. v. Four Pillars Enter. Co., 45 Fed. Appx. 479, 484 (6th Cir. 2002) (citing Fed. R. Evid. 701 advisory notes).  Thus, as relevant here, any opinion regarding the propriety of defendant's use of force--and whether it was in violation of or inconsistent with LASD policies and trainings-- necessarily draws upon technical or other specialized knowledge. Accordingly, only properly designated and qualified experts should be

1  permitted to offer their opinions bearing on that issue.[4]  Defendant

2  should not be able to circumvent the precautions set forth in Rule

3  702 for expert testimony in order to backdoor inadmissible opinion

4  evidence at trial through any of the LASD officers he has noticed as

5  potential witnesses (Alejandre, Stowers, or Villalobos).  For these

6  reasons, Rule 701 bars the testimony of any lay witness called to

7  testify regarding their opinions about the reasonableness of

8  defendant's use of force or whether it conformed to LAPD policy.

9       **C.    Hearsay Generally and Admissions of Party Opponent**

10       As a general matter, Federal Rule of Evidence 801(c) defines

11  hearsay as "a statement, other than one made by the declarant while

12  testifying at the trial or hearing, offered in evidence to prove the

13  truth of the matter asserted."  Fed. R. Evid. 801(c).  Testimony that

14  is not offered for the truth of the matter asserted, but for another

15  purpose, is not hearsay.  See e.g., United States v. Arteaga, 117

16  F.3d 388, 396 (9th Cir. 1997) (statements offered for "effect on

17  hearer" are offered for a non-truth-related purpose); United States

18  v. Echeverry, 759 F.2d 1451, 1456 (9th Cir. 1985) (statements offered

19  not for truth but as necessary background information admissible as

20  non-hearsay); United States v. Gibson, 690 F.2d 697, 700 (9th Cir.

21  1982) (statements admissible because offered to establish fact they

22  were made and not for truth of matter asserted); United States v.

23

24       [4] Moreover, neither lay witnesses under Rule 701 nor expert
witnesses under Rule 702 may opine on the ultimate issues of whether
25  defendant's use of force was excessive or unreasonable or whether he
acted willfully in depriving J.H. of her rights.  In the context of
26  excessive force, proper expert testimony can discuss "policies and
professional standards of practice," but may not opine on whether the
27  "defendant['s] use of force was reasonable under the circumstances"
as this "is just such an opinion on an ultimate issue of law that
28  risks usurping the jury's province."  Mukhtar v. California State
University, Hayward, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002).

1    *Valerio*, 441 F.3d 837, 844 (9th Cir. 2006) (informant's statements on
2    a recording are admissible to give context to defendant's statements
3    because "[k]nowing what [defendant] meant by what he said would be
4    difficult without knowing what words he was responding to").

5        The United States intends to introduce statements made by
6    defendant, including numerous statements he made in the lead-up to,
7    during, and in the aftermath of the use of force incident at WinCo,
8    as captured in BWC and other video footage.[5]   Statements by the
9    defendant, when offered by the government, are admissions by a party-
10   opponent and are therefore not hearsay under Fed. R. Evid. 801(d)(2).
11   United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).
12   Importantly, however, the rule does not go both ways.  While the
13   United States may present evidence regarding defendant's statements,
14   defendant's statements offered by him are inadmissible hearsay.  *Id.*
15   (non-self-inculpatory statements, even if made contemporaneously with
16   other self-inculpatory statements, are inadmissible hearsay); see
17   also United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988).

18       The United States anticipates that the defense may seek to
19   elicit from witnesses (either those called in the United States'
20   case-in-chief or in the defense case) various self-serving statements
21   made by defendant.  Such testimony, as elicited by the defense,
22   constitutes inadmissible hearsay.  To permit otherwise would place a

23

24       [5] Defendant also wrote an incident report related to the use of
     force incident several hours after the events at the WinCo store.
25   The United States reserves its ability to elicit defendant's
     statements from that report as party admissions, including to impeach
26   defendant if he presents testimony or evidence in contradiction with
     the statements he made in his report.  However, any attempt by the
27   defense to admit defendant's statements in the report would be
     inadmissible hearsay.  The United States understands from its meet-
28   and-confers that defense will not seek to admit any part of
     defendant's incident report during trial.

1    defendant's statements "before the jury without subjecting himself to

2    cross-examination, precisely what the hearsay rule forbids." Ortega,

3    203 F.3d at 682 (citation omitted).

4        Moreover, any argument based on the Rule of Completeness under

5    Rule 106 is applicable only when one party seeks to introduce a

6    misleadingly tailored excerpt of a statement. Fed. R. Evid. 106.

7    Rule 106 "does not, however, require the introduction of any unedited

8    writing or statement merely because an adverse party has introduced

9    an edited version." United States v. Vallejos, 742 F.3d 902, 905

10   (9th Cir. 2014). It is proper to admit segments of a conversation

11   without including the entire conversation, and adverse parties are

12   not entitled to offer additional statements just because they exist

13   and the proponent has not offered them. See United States v.

14   Collicott, 92 F.3d 973, 983 (9th Cir. 1996). If the statements

15   offered by the defendant do not clarify a misleading impression, the

16   district court should exclude them. Vallejos, 742 F.3d at 905; see

17   also United States v. Crosgrove, 637 F.3d 646, 661 (6th Cir. 2011)

18   (finding that defendant could not introduce text messages under Rule

19   106 because messages were too far removed in time to correct any

20   misleading impression). Finally, Rule 106 does not make otherwise

21   inadmissible evidence admissible. Collicott, 92 F.3d at 983.[6]

22       D.   **Exceptions to the Hearsay Rule**

23       The United States intends to offer certain video recordings that

24   contain out of court statements that are not hearsay, as well as

25   statements where applicable hearsay exceptions apply. Such

26

27       [6] Notwithstanding these governing principles, the United States
     has met and conferred with the defense and understands defense does
28   not intend to object to the introduction of certain portions of video
     recordings from LASD personnel's BWCs.

1  statements may include those made by J.H. or D.B. during their

2  encounters with LASD or other responding LASD officers besides

3  defendant.

4      As previously explained, statements that are not offered for the

5  truth of the matter asserted, but rather as context for what

6  defendant said or did, verbal acts, effect on the listener, or other

7  non-hearsay purposes do not fall within the preclusions of Rule 801

8  and 802.  Moreover, Rule 803 provides numerous exceptions to the rule

9  against hearsay that apply to statements the United States may seek

10 to offer at trial, including the following hearsay exceptions:[7]

11     ***Present Sense Impression.***  Rule 803(1) excepts from the rule

12 against hearsay a "statement describing or explaining an event or

13 condition, made while or immediately after the declarant perceived

14 it."  Fed. R. Evid. 803(1); see also People of Territory of Guam v.

15 Ignacio, 10 F.3d 608, 614 (9th Cir. 1993) ("Since the victim made the

16 statements while she was experiencing the pain, they come within the

17 present sense impression exception.").  Among other things, J.H.'s

18 statements about her pain and trouble breathing in the aftermath of

19 the use of force incident would be admissible under this exception

20 and are relevant to things for which the United States carries the

21 burden at trial--whether J.H. suffered bodily injury or the pepper

22 spray caused her extreme physical pain.

23     ***Excited Utterance.***  Rule 803(2) similarly carves out of the

24 hearsay rule a "statement relating to a startling event or condition,

25 made while the declarant was under the stress of excitement that it

26

27

28     [7] The discussion of specific exceptions here is exemplary only, and the United States reserves the right to rely on other hearsay exceptions not described herein.

1  caused."  Fed. R. Evid. 803(2); see also Ignacio, 10 F.3d at 614-15

2  (statement to babysitter about one hour after assault admissible as

3  excited utterance).  For example, J.H.'s complaints of pain and

4  discomfort to LASD personnel, hospital staff and others would qualify

5  as admissible excited utterances.

6      ***Then-Existing Mental, Emotional, or Physical Condition.***  Similar

7  to the hearsay exception for present sense impressions, Rule 803(3)

8  excepts from the rule against hearsay a "statement of the declarant's

9  then-existing state of mind (such as motive, intent, or plan) or

10 emotional, sensory, or physical condition (such as mental feeling,

11 pain, or bodily health), but not including a statement of memory or

12 belief to prove the fact remembered or believed unless it relates to

13 the validity or terms of the declarant's will."  Fed. R. Evid.

14 803(3); see also Wagner v. County of Maricopa, 747 F.3d 1048, 1053

15 (9th Cir. 2013) ("The statements were offered to show his state of

16 mind at the time of the conversation, thus satisfying any

17 contemporaneity requirement.").

18     ***Statement Made for Medical Diagnosis or Treatment.***  Under Rule

19 803(4), a statement that "(A) is made for--and is reasonably

20 pertinent to--medical diagnosis or treatment; and (B) describes

21 medical history; past or present symptoms or sensations; their

22 inception; or their general cause," is not excluded by the rule

23 against hearsay.  Fed. R. Evid. 803(4); see also Ignacio, 10 F.3d at

24 613 ("The rationale for the exception is that the patient can be

25 expected to tell the truth about her injury because she will want to

26 be diagnosed correctly and treated appropriately.").  J.H.'s

27 statements to medical personnel at Antelope Valley Medical Center, in

28

1  part captured over BWC footage, would be admissible under this

2  hearsay exception.

3      ***Business Records.***  Rule 803(6) carves out an exception to the

4  hearsay rule for business records.  A document is admissible under

5  this rule if two foundational facts are established: (1) the document

6  was made or transmitted by a person with knowledge at or near the

7  time of the incident recorded, and (2) the document was kept in the

8  course of a regularly conducted business activity.  United States v.

9  Ray, 930 F.2d 1368, 1370 (9th Cir. 1990).  The foundation may be

10  established either through a custodian of records or "another

11  qualified witness."  Fed. R. Evid. 803(6). "The phrase 'other

12  qualified witness' is broadly interpreted to require only that the

13  witness understand the record keeping system."  United States v.

14  Childs, 5 F.3d 1328, 1334 (9th Cir. 1993); Ray, 930 F.2d at 1370.

15  The United States does not need to establish when and by whom the

16  document was prepared.  Ray, 930 F.2d at 1370.  Because Rule 803(6)

17  represents a firmly rooted hearsay exception, if non-testimonial

18  evidence meets the requirements for admission under the Rule, no

19  further showing of reliability is necessary for admission under the

20  Confrontation Clause.  See Ohio v. Roberts, 448 U.S. 56, 66 n.8

21  (1980), overruled on other grounds by Crawford v. Washington, 541

22  U.S. 36 (2004); Ray, 930 F.2d at 1371.

23      The United States has produced to the defense Rule 902(11)

24  declarations from custodians of records from LASD and the Antelope

25  Valley Medical Center governing business records maintained by these

26  entities in conformity of the requirements of Rule 803(6).  In any

27  event, as noted in section IV.A above, the defense has informed the

28  United States that it will not object to the authenticity,

foundation, or admissibility on hearsay grounds of most categories of evidence the United States will seek to admit.

**E.    Written Transcripts of Audio/Video Recordings**

The United States has prepared transcripts for most of the audio/video recording clips it will seek to admit at trial, including footage from the BWCs worn by LASD personnel.  The United States has produced several of these draft transcripts to the defense and will be producing the balance before trial.  Final transcripts accompanying the clips will be displayed on a screen simultaneous to the playing of the audio/video files, but the transcripts will not be admitted into evidence.  See United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975) (permitting the transcripts of sound recordings to be used contemporaneously with the introduction of the recordings into evidence).  The United States should be able to play the clips with the accompanying scrolling transcripts.

On a related note, for the jury to consider the evidence on an audio/video recording, it must be played in open court.  Allowing jurors to take into the jury room recordings that were not played in open court is structural error requiring automatic reversal if a defendant objects to allowing the jurors to have the un-played audio/video recordings in the jury room.  United States v. Noushfar, 78 F.3d 1442, 1445-46 (9th Cir. 1996).

**F.    Expert Testimony**

The United States has noticed former LASD Lieutenant and Police Procedures Consultant Roger Clark to offer expert testimony at trial under Rule 702.  While the defense has not challenged the reliability

1  nor admissibility of Mr. Clark's anticipated opinions,[8] the United

2  States nonetheless will request that the Court make an express

3  reliability finding on the record as required by United States v.

4  Holguin, 51 F.4th 841 (9th Cir. 2022).

5      In Holguin, the Ninth Circuit held that "district courts must

6  make explicit findings that the government's expert testimony was

7  reliable."  Id. at 851.  As the Court explained, "[a] district court

8  abdicates its gatekeeping role, and necessarily abuses its

9  discretion, when it makes no reliability findings.  Reliability

10 findings must be made explicit on the record--an implicit finding

11 does not suffice.  This requirement ensures that district courts

12 engage in the reliability inquiry and create a record of that inquiry

13 to facilitate appellate review."  Id. at 851 (citations and

14 quotations omitted); see also id. at 855-56 (explaining that

15 "[e]xperience alone is a reliable basis for the expert testimony" in

16 certain contexts, especially where the "expert generally testified

17 based on their experience rather than based on any systematic

18 methodology").  After Mr. Clark describes his qualifications,

19 principles, and methodologies, the United States will request that

20 the Court make an express reliability finding on the record, which,

21 based on the pretrial conference, the United States understands will

22 happen at sidebar or on a break before Mr. Clark offers his expert

23 opinions.

24

25

26

27
_____

28      [8] The United States provided written notice of its expert's
anticipated opinions pursuant to Federal Rule of Criminal Procedure
16(a)(1)(G) on January 13, 2025.

### G.    Summary Exhibits

The United States may seek to offer a summary timeline exhibit under Rule 1006 that synthesizes a voluminous amount of audio/video evidence, including audio/video recordings the United States may not otherwise introduce into evidence.  A summary chart may be admitted as substantive evidence when the proponent establishes that the underlying materials upon which the summary is based are voluminous, admissible, and available for inspection.  United States v. Johnson, 594 F.2d 1253, 1255-56 (9th Cir. 1979); see also United States v. Rizk, 660 F.3d 1125, 1130 (9th Cir. 2011); United States v. Aubrey, 800 F.3d 1115, 1130 (9th Cir. 2015).  Although the materials underlying the summary must be admissible, they need not themselves be admitted into evidence.  Rizk, 660 F.3d at 1130—31.  In addition, the summary chart must be accurate, authentic, and properly introduced.  United States v. Scales, 594 F.2d 558, 563 (6th Cir. 1979) (affirming introduction of summary charts presenting an organization of undisputed objective evidence in terms of relevant counts of the indictment).  Any contention that the chart may contain inaccuracies or omissions goes to the weight of the evidence, not its admissibility.  Rizk, 660 F.3d at 1131 at n.2.

Rule 1006 does not require that a jury's examination of the underlying records be literally impossible before a summary or a chart may be utilized.  "All that is required for the rule to apply is that the underlying writings be 'voluminous' and that in court examination not be convenient."  Scales, 594 F.2d at 562.  Where a chart does not contain complicated calculations that would require an expert for accuracy, authentication of the chart requires only that the witness (1) have properly catalogued the exhibits and records

1  upon which the chart is based; and (2) have knowledge of the analysis

2  of the records referred to in the chart.  Id.; see Goldberg v. United

3  States, 789 F.2d 1341, 1343 (9th Cir. 1986) (upholding district

4  court's determination that the testimony of a revenue agent as to

5  summaries of voluminous tax records did not include any expert

6  opinions or conclusions).  The use of other persons in the

7  preparation of summary evidence goes to the weight of the evidence,

8  not its admissibility.  See United States v. Soulard, 730 F.2d 1292,

9  1299 (9th Cir. 1984).

10      **H.   Cross Examination of Defendant**

11      A defendant who testifies at trial may be cross-examined as to

12  all matters reasonably related to the issues he puts in dispute

13  during direct examination, such as his intent and knowledge.  "A

14  defendant has no right to avoid cross-examination on matters which

15  call into question his claim of innocence."  United States v.

16  Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).  See, e.g.,

17  United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What

18  the defendant actually discusses on direct does not determine the

19  extent of permissible cross-examination or his waiver.  Rather, the

20  inquiry is whether 'the government's questions are reasonably

21  related' to the subjects covered by the defendant's testimony.")

22  (internal quotations and citation omitted).  The scope of cross-

23  examination is within the discretion of the trial court.  Fed. R.

24  Evid. 611(b).

25      **I.   Use of Defendant's Proffer Statements**

26      Before the indictment in this case, defendant sat for a

27  voluntary interview with the United States subject to a "Queen for a

28  Day" proffer agreement.  While the proffer agreement set forth

27

limitations on how the United States could use information provided by defendant during the proffer, including during a later trial against defendant, the agreement provided exceptions that may be implicated during the upcoming trial.  Among other things, the proffer agreement signed by defendant and his counsel provided that the United States may "[u]se statements made by [defense counsel] or [defendant] at the meeting and all evidence obtained directly or indirectly from those statements for the purpose of cross-examination should your client testify, or to refute or counter at any stage of the proceedings (including this Office's case-in-chief at trial) any evidence, argument, statement or representation offered by or on behalf of your client in connection with any proceeding."  The proffer agreement also permits the United States to use defendant's statements against him for any purpose if the United States concludes that defendant "knowingly withheld material information from this Office or otherwise [had] not been completely truthful and candid" during the voluntary interview.

Where a defendant has made statements to the United States during a proffer, determining whether the United States can use those statements in its case-in-chief at trial requires an examination of the proffer agreement, which is a contract and its terms are thus governed by contract principles.  See, e.g., United States v. Chui, 109 F.3d 624, 625 (9th Cir. 1997) (proffer agreements are governed by contract principles); United States v. Barrow, 400 F.3d 109, 117 (2d Cir. 2005) (same).  Enforcing proffer agreements to admit a defendant's proffer statements "encourages criminal defendants to present defenses at trial that are not fraudulent." United States v. Rebbe, 314 F.3d 402, 408 (9th Cir. 2002).  And doing so does not

1    deprive the defendant of a right to present a defense at trial given

2    that the only limitations are based on defendant's breaching or

3    waiving of the terms of the proffer agreement.  Id.  Indeed,

4    enforcing the terms of the proffer agreements expressly "will assist

5    in promoting the truth-seeking function" of the trial.  Id. at 407.

6        The Ninth Circuit has upheld proffer agreements nearly identical

7    to the agreement signed here by defendant and permitted the United

8    States' introduction of a defendant's proffer statements to rebut

9    "any evidence, statement, or representation" offered by or on his

10   behalf.  See, e.g., id. at 408 (permitting use of proffer statements

11   that were "inconsistent" with "evidence or arguments" advanced by

12   defendant at trial); United States v. Petrosian, 661 F. App'x 903,

13   903 (9th Cir. 2016) (approving government's use of proffer statements

14   in its case in chief under the proffer agreement and collecting cases

15   from several circuits holding the same); see also United States v.

16   Krilich, 159 F.3d 1020, 1025-26 (9th Cir. 1998) ("Statements are

17   inconsistent only if the truth of one implies the falsity of the

18   other.").

19       The United States hereby provides notice that it may seek to

20   offer defendant's proffer statements during its case-in-chief, during

21   cross-examination of defendant (should he testify), and/or through

22   rebuttal if any of the bases described above and in defendant's

23   proffer agreement be implicated at trial.

24       **J.    Inadmissibility of Specific Prior Good Acts of Defendant
             and Other Issues Regarding Character Evidence**

25

26       Federal Rule of Evidence 404(a)(1) prohibits the use of a

27   "person's character or character trait" to "prove that on a

28   particular occasion the person acted in accordance with the character

or trait." There is, however, a limited exception to this blanket prohibition for defendants in a criminal case, permitting a defendant to "offer evidence of the defendant's pertinent trait." Fed. R. Evid. 404(a)(2)(A). But if such evidence is admitted, "the prosecutor may offer evidence to rebut it." Id.

Here, the Court should not permit defendant to offer testimony and evidence that he is a good and honorable man. For instance, defendant should not be permitted to highlight his past achievements or accolades he has received, or his prior military service, which would only serve to further the message that defendant is a "good" or "noble" person. Those are not traits of character, let alone pertinent ones, as Rule 404(a)(2)(A) requires. "The Ninth Circuit has previously recognized that honesty, truthfulness, law-abidingness, peaceableness, and being 'a violent and angry person' are 'character traits' within the meaning of Rule 404(a)." United States v. Weber, No. CR 21-28-M-DLC, 2022 WL 2463039, at *2 (D. Mont. July 6, 2022) (collecting cases); see also United States v. Diaz, 961 F.2d 1417, 1419 (9th Cir. 1992) (recognizing validity of "general traits such as 'lawfulness' and 'law-abidingness.'"); In re Sealed Case, 352 F.3d 409, 412 (D.C. Cir. 2003) ("specific character traits for truthfulness and honesty" admissible both when defendant testifies and when charge includes "fraud or falsehood [a]s one of its statutory elements"). Being a good person or friend or acting in honorable ways are not pertinent traits of character within the meaning of Rule 404(a).

Just as important, offering character evidence through specific acts plainly violates Rule 405. Where a trait of character is admissible, Rule 405(a) limits the manner and method of proving that

trait.  On direct, only "testimony about the person's reputation or by testimony in the form of an opinion" is permissible.  Fed. R. Evid. 405(a); United States v. Hedgcorth, 873 F.2d 1307, 1313 (9th Cir. 1989) ("[W]hile a defendant may show a character for lawfulness through opinion or reputation testimony, evidence of specific acts is generally inadmissible.") (citing Michelson v. United States, 335 U.S. 469, 476 (1948)).  Thus, specific acts evidence is generally prohibited when offered by a defendant.  Id.

The United States, however, may inquire "into relevant specific instances of the person's conduct" on cross-examination of a defense character witness.  Fed. R. Evid. 405(a).  "A witness who has endorsed the character of the defendant may be cross-examined about whether he's heard about prior bad acts of the defendant." United States v. Bush, 58 F.3d 482, 489 (9th Cir. 1995); see also Michelson, 335 U.S. at 479 ("The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.").

**K.    Not Calling Specific Witnesses at Trial**

The United States is still determining which witnesses it will call at trial.  In that process, the United States may not ultimately call a particular witness--whether it be defendant's co-responding deputy Felipe Alejandre or a different later responding deputy, victim J.H. or D.B., a witness from WinCo, or some other witness.  If defendant asserts at trial that the United States should have called a specific witness (and chooses not to call that witness himself) and consequently argues that the United States cannot meet its burden

1  without that testimony, the United States is providing notice that

2  such an action opens the door to the following argument.

3       The Ninth Circuit's model criminal jury instructions provide

4  that the United States' burden is to leave the jury "firmly

5  convinced" of defendant's guilt.  Mod. Crim. Instr. 6.5.  To meet its

6  burden at trial, the United States need not present every imaginable

7  witness or every shred of possible evidence.  Under circumstances

8  where a defendant asserts that the United States should have called a

9  specific witness, that opens the door for the United States to make

10  the jury aware that defendant has subpoena power to call that witness

11  too.  A "'prosecutor may properly comment upon a defendant's failure

12  to present witnesses so long as it is not phrased to call attention

13  to defendant's own failure to testify.'"  United States v. Castillo,

14  866 F.2d 1071, 1083 (9th Cir. 1988) (quoting United States v.

15  Fleishman, 684 F.2d 1329, 1343 (9th Cir. 1982)), cert. denied, 459

16  U.S. 1044 (1982); see also United States v. Reyes, 966 F.2d 508, 509

17  (9th Cir. 1992) ("While prosecutors may not comment on a defendant's

18  failure to testify, they may comment on the defense's failure to call

19  other witnesses."); United States v. Cabrera, 201 F.3d 1243, 1250

20  (9th Cir. 2000) (prosecutor's comment on defendant's failure to call

21  a witness "did not shift the burden of proof or persuasion").  "The

22  test is whether the comment is 'manifestly intended to call attention

23  to the defendant's failure to testify, and is . . . of such a

24  character that the jury would naturally and necessarily take it to be

25  a comment on the failure to testify.'"  Castillo, 866 F.2d at 1083

26  (quoting United States v. Bagley, 722 F.2d 482, 494 (9th Cir. 1985)).

27  "'[W]here the defendant opens the door to an argument, it is 'fair

28  advocacy' for the prosecution to enter.'"  United States v. Williams,

1  990 F.2d 507, 510 (9th Cir. 1993) (quoting <u>United States v. Falsia</u>,

2  724 F.2d 1339, 1342 (9th Cir. 1983)).

3      If defendant opens the door by implying, arguing, or saying in

4  any way, shape, or form that the United States should have called a

5  particular witness, the United States hereby provides notice that <u>the</u>

6  <u>United States plans to walk through that door and make the jury aware</u>

7  <u>that defendant has subpoena power to call the same witness too</u>.

8      **L.    Nullification**

9      The United States also reserves the right to object to any

10  evidence and/or argument relating to any possible jury nullification

11  defense, including concerning punishment or that victim J.H.'s rights

12  are more appropriately vindicated in the civil lawsuit she filed

13  against defendant or that this case is simply a personnel issue and

14  the appropriate remedy is to fire defendant from his job.  A

15  defendant has no right to present evidence relevant only to such a

16  defense.  <u>United States v. Powell</u>, 955 F.2d 1206, 1213 (9th Cir.

17  1992); <u>Zal v. Steppe</u>, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J.,

18  concurring) ("[N]either a defendant nor his attorney has a right to

19  present to a jury evidence that is irrelevant to a legal defense to,

20  or an element of, the crime charged.").

21  **VI.  CONCLUSION**

22      The United States respectfully requests leave to supplement this

23  Trial Memorandum, as necessary.

24

25

26

27

28