BILAL A. ESSAYLI
United States Attorney
ROBERT J. KEENAN (Bar No. 151094)
Assistant United States Attorney
 UNITED STATES ATTORNEY'S OFFICE
 411 W. Fourth Street
 Suite 8000
 Santa Ana, California 92701
 Telephone: (714) 338-3597
 Facsimile: (714) 338-3708
 E-Mail:    rob.keenan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:24-00527-SVW |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION STATEMENT IN RESPONSE TO PRE-SENTENCE REPORT RE. DEFENDANT TREVOR JAMES KIRK |
| v. | |
| TREVOR JAMES KIRK, | [Fed. R. Crim. P. 32(f)(1)] |
| Defendant. | DATE:    May 19, 2025 TIME:    11:00 a.m. PLACE:   FSCH, Courtroom 10-A EST:     20 minutes |

# **TABLE OF CONTENTS**

INTRODUCTION.................................................1

POST-TRIAL AGREEMENT RE. PLEA & SENTENCING..................2

PARTIES' SENTENCING GUIDELINE CALCULATIONS.................5

USPO'S SENTENCING CALCULATIONS & RECOMMENDATION............6

RESPONSE TO PRE-SENTENCE REPORT............................6

    A.   Objections to Offense Level Calculation..........6

    B.   The Correct Base Offense Level..................7

    C.   The Obstruction of Justice Enhancement Is Improper.......14

RESTITUTION................................................19

CRIME VICTIMS' RIGHTS ACT.................................19

1

**INTRODUCTION**

2      On September 4, 2024, a grand jury indicted defendant TREVOR

3  JAMES KIRK for a violation of 18 U.S.C. § 242 (Willful Deprivation of

4  Rights Under Color of Law).  Specifically, the indictment alleged

5  that, on June 24, 2023, defendant, then acting as a Deputy with the

6  L.A. County Sheriff's Department ("LASD"), used unreasonable and

7  unnecessary force to detain and secure victim J.H.'s person while

8  attempting to conduct an investigatory detention of "J.H." and her

9  associate "D.B." for a reported robbery at a grocery store in

10  Lancaster, CA, which thereby deprived J.H. of the right, as stated in

11  the Fourth Amendment, "to be secure in [her] person[] … against

12  unreasonable … seizure" of her person.  (CR 1 at 2, 5.)[1]  The

13  indictment also alleged felony enhancements that, during his

14  commission of the offense, defendant used a "dangerous weapon" (<u>i.e.</u>,

15  pepper spray) and caused J.H. to sustain "bodily injury."

16      On February 6, 2025, after a two-day trial, a jury found

17  defendant guilty of Deprivation of Rights Under Color of Law, in

18  violation of 18 U.S.C. § 242.  (CR 51 at 2.)  In its verdict, the

19  jury also made an ambiguous special finding that "J.H. suffered

20  bodily injury as a result of [defendant]'s acts" <u>or</u> "the defendant[]'

21  acts included the use of a dangerous weapon."  (<u>Id.</u>)[2]

22

23      _____

24      [1]  "CR" refers to the Clerk's Record (a/k/a the docket sheet)
and is followed by the docket number for the subject document.

25      [2]  The verdict form was prepared and filed by the Government on
January 20, 2025, with defendant's assent.  (CR 29.)  After belatedly
26  perceiving the form's ambiguity, the Government filed a revised
proposed verdict form on the morning of February 6, 2025, shortly
27  before closing arguments were to commence.  (CR 44.)  Defendant
objected to the revised form, and the Court declined to use it.  (<u>See</u>
28  CR 60 at 5-7.)

1

In mid-April, the parties filed a stipulation to continue the sentencing to permit the Government additional time to review the facts and proceedings in this case.[3]  The Court denied the proposed continuance.  In this brief, the Government objects to the PSR's Guideline calculations and states its sentencing recommendation.

## POST-TRIAL AGREEMENT RE. PLEA & SENTENCING

On May 1, 2025, the parties filed a "Post-Trial Agreement Re. Plea and Sentencing."  (CR 82.)  In that agreement, defendant agrees to plead guilty to a misdemeanor violation of 18 U.S.C. § 242, which is a lesser-included offense of the count charged in the indictment. (CR 82 at 2-3.)  Defendant also agrees to admit under oath, and for the first time, that he "used unnecessary force" while attempting to detain J.H. on June 24, 2023 and that he did so "willfully."  (Id. at 9.)  Moreover, provided that the Court accepts the agreement, defendant has agreed to waive his right to appeal the misdemeanor conviction and the stipulated sentence and also waive his right to

---

[3]  Post-trial review and reconsideration of litigative positions in a given case, or a group of cases, is not new.  In December 2022, for example, the Department issued a memorandum that established a new set of policies regarding charging, pleas, and sentencing and, to ensure compliance with it, directed prosecutors to review all pending cases "in which a final judgment after sentencing [had] not been imposed" and to "take steps to render the charging document, any plea agreement, and the sentence consistent with these policies."  See Garland Memo, at 6 (Dec. 16, 2022).  That directive applied even "if a defendant has already been convicted at trial" and, in appropriate cases, required the dismissal or striking of statutory sentencing enhancements.  In March 2023, the USAO created a Conviction Integrity Committee that would "continually review our work as prosecutors and will buttress all of the policies and procedures designed to prevent wrongful convictions."  And, long before any of those policies were issued, line prosecutors were allowed (with supervisory approval) to dismiss or strike statutory enhancements after trial to ensure substantial justice.  See, e.g., United States v. Juan Zazueta, Case No. SA CR 04-251-AHS (Jan. 19, 2007) (post-trial agreement in which USAO agreed to strike § 851 Information to avoid unwarranted disparity in sentencing of defendant and co-defendants).

collaterally attack the conviction and sentence.  (Id. at 1-2, 11-12.)

These concessions by defendant are significant.  As the Court well knows, a verdict in any case — civil or criminal — is not the end of the matter.  Here, the defendant has the right to appeal the conviction, including the fairness of the trial, rulings on evidentiary issues, the validity of the jury instructions, the sufficiency of the evidence, and any other claims of error that he believes occurred during the proceedings in this case.  He would also have the right to appeal the sentence based on misapplication of the Guidelines and the reasonableness of the sentence, and, for the reasons noted below, he would have the Government's support on both of those points.  Even if the conviction were affirmed on direct appeal, he would still have the right to pursue a collateral attack under the habeas remedy codified in 28 U.S.C. § 2255.  All of those proceedings would tax judicial and prosecutorial resources, delay resolution of the case, and deny the parties and the public a sense of closure and finality.

Thus, in accordance with the Post-Trial Agreement and 18 U.S.C. § 3553(a), the Government hereby recommends that the Court impose the sentence that the parties have agreed upon, namely, the following: (1) a mandatory special assessment of $25; (2) a fine as determined by the Court, but no greater than $5,500; (3) restitution, if any, to be determined by the Court; and (4) a one-year term of probation, on the conditions specified in Paragraph 17 of the agreement, namely: (a) defendant shall comply with the rules and regulations of the United States Probation & Pretrial Services Office and Second Amended General Order 20-04; (b) defendant shall not commit any violation of

1  local, state, or federal law or ordinance; (c) during the period of

2  probation, defendant shall pay any criminal debt in accordance with

3  the judgment's order pertaining to such payment; and (d) defendant

4  shall cooperate in the collection of a DNA sample from the defendant.

5  (See CR 82 at 10-11.)

6      For the misdemeanor offense to which defendant has agreed to

7  plead guilty, and in light of the Government's review of the evidence

8  and trial transcripts, the Government believes this sentence is

9  "sufficient, but not greater than necessary," to satisfy the

10  sentencing objectives set forth in 18 U.S.C. § 3553(a).  Defendant

11  has no criminal history, and the nature and circumstances of the

12  offense, including J.H.'s injuries (which were limited in duration

13  and severity), do not call for a more severe sentence.  A sentence of

14  the type suggested in the Pre-Sentence Report (i.e., 108-120 months'

15  imprisonment) is patently unjust on these facts; it is not even close

16  to reasonable.  And, in a case that reminds police officers of the

17  need to avoid excess in the discharge of their duties, § 3553(a)'s

18  above-quoted language provides an important reminder to prosecutors

19  and courts alike of the need to avoid excess in sentencing.

20      It also bears noting that, prior to trial, the Government was

21  willing to enter into a plea agreement that would have allowed

22  defendant to plead to a misdemeanor violation of § 242.

23  Specifically, in an e-mail to defendant's attorneys, dated December

24  20, 2024, Government counsel advised as follows:

25         "After running your request up the chain
           of command for a diversionary disposition
26         in this matter, we unfortunately are
           unable to agree to a diversionary
27         disposition.  However, we are authorized
           to keep open our offer in principle to a
28         misdemeanor disposition[.]"

4

So, the Government's Post-Trial Agreement for a misdemeanor disposition is not a sharp departure from the Government's prior assessment of this case and how it should be resolved.  Moreover, by offering a post-trial misdemeanor disposition, the Government avoids the appearance of imposing a so-called "trial tax" on defendant simply because he exercised his right to trial.

### PARTIES' SENTENCING GUIDELINE CALCULATIONS

In Paragraph 15 of the Post-Trial Agreement, the parties agreed to the following Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 10 | USSG § 2H1.1(a)(3) |
| Offense Characteristics | | |
| Offense Under Color of Law: | +6 | USSG § 2H1.1(b)(1)(B) |
| Adjustments | | |
| Acceptance of Responsibility: | -3 | USSG §§ 3E1.1(a),(b) |
| Total Offense Level: | 13 | |
| Criminal History Category: | I | |
| Guideline Range: | 12-18 months' imprisonment | |
| Fine: | $5,500-$55,000 | |

(CR 82 at 10.)  The parties further "agree[d] not to argue that any other specific offense characteristics, adjustments, or departures be imposed."  (Id.)

Provided defendant continues to accept responsibility for the misdemeanor offense in accordance with the Agreement, the Government hereby moves for a full three-level downward adjustment under USSG § 3E1.1(b).  Based on Booker and § 3553(a), the Government further

1  recommends the probationary sentence set forth above and in the
2  Agreement.

3  **USPO'S SENTENCING CALCULATIONS & RECOMMENDATION**

4      In the Revised Pre-Sentence Report ("PSR"), dated May 6, 2025,
5  the USPO states that defendant's Total Offense Level is _31_.  (PSR
6  ¶ 65.)  Defendant has zero criminal history points, which puts him in
7  Criminal History Category _I_.  (PSR ¶ 71.)  Thus, the USPO concludes
8  that the Guidelines' advisory sentencing range is 108-120 months'
9  imprisonment, with the statutory maximum capping the high-end of the
10 Guideline range.  (PSR ¶ 127.)

11     Based on the verdict, the PSR states that the statutory maximum
12 sentence for the offense of conviction is 10 years (or 120 months) of
13 imprisonment.  (PSR ¶ 126.)  The USPO recommends a term of 87-months.
14 (See USPO Ltr. at 1.)

15  **RESPONSE TO PRE-SENTENCE REPORT**

16     As noted above, the Government believes the Guideline sentencing
17 range, as calculated in the PSR, is "patently unjust" and "not even
18 close to reasonable."  To be clear, though, that sentencing range is
19 due to misapplication of the Guidelines, which was urged erroneously
20 by the Government.  We correct that error here.

21     **A.   Objections to Offense Level Calculation**

22     The PSR's calculation of defendant's Total Offense Level is
23 incorrect because it erroneously imports the guideline for
24 "aggravated assaults" (USSG § 4A2.2) to determine the Base Offense
25 Level, which produced a Base Level of 23, instead of the correct Base
26 Level of 10.  For that reason, the Government objects to PSR ¶¶ 42-53
27 in their entirety.  The Government also objects to PSR ¶¶ 58-60 for
28 their misapplication of a two-level "obstruction of justice"

1  enhancement under USSG § 3C1.1.  The Court should calculate the

2  Guidelines range in accordance with the parties' Post-Trial

3  Agreement.

4      **B.    <u>The Correct Base Offense Level</u>**

5      Section 2H1.1 is the guideline applicable to Offenses Involving

6  Individual Rights, including violations of 18 U.S.C. § 242, and it

7  provides that the Base Offense Level is to be determined by

8  "apply[ing] the greatest" of the following options: "(1) the offense

9  level from the offense guideline applicable to any underlying

10 offense; (2) 12, if the offense involved two or more participants;

11 (3) 10, if the offense involved (A) the use or threat of force

12 against a person, or (B) property damage or the threat of property

13 damage; or (4) 6, otherwise."  <u>See</u> USSG § 2H1.1(a).  As to the first

14 option, the Court must look to "the offense guideline applicable to

15 any conduct established by the offense of conviction that constitutes

16 an offense under federal, state, or local law."  <u>See</u> § 2H1.1,

17 Application Note 1.

18     In a memo to the USPO, the Government contended that the

19 guideline most applicable to defendant's underlying offense conduct

20 was § 2A2.2, which applies to "Aggravated Assaults."  That guideline

21 produces the "greatest" Base Offense Level (23), well above the 10-

22 level base under § 2H1.1(a)(3).  (PSR ¶¶ 42-53.)

23     The Guidelines define "aggravated assault" as follows:

24         "Aggravated assault" means a felonious assault
           that involved **(A) a dangerous weapon with**

25         **intent to cause bodily injury (<u>i.e.</u>, not merely**
           **to frighten) with that weapon; (B) serious**

26         **bodily injury;** (C) strangling, suffocating, or
           attempting to strangle or suffocate; or (D) an

27         intent to commit another felony.

28

7

<u>Id.</u> § 2A2.2, cmt. n.1.  The USPO determined that defendant's conduct qualified as an "aggravated assault" based on the first two grounds: (a) it involved a "dangerous weapon" (<u>i.e.</u>, pepper spray) "with intent to cause bodily injury"; and (b) it involved "serious bodily injury" to victim J.H.  (PSR ¶ 50.)

   <u>First</u>, regardless whether pepper spray qualifies as a "dangerous weapon" (<u>i.e.</u>, "an instrument <u>capable</u> of inflicting death or serious bodily injury," per USSG § 1B1.1, comment. n.1(E)), the evidence in this case does not show that defendant sprayed J.H. in the face "with intent to cause bodily injury."  After he forcibly threw J.H. to the ground (<u>see</u> Ex. 45, at time-mark 2:18), defendant struggled with J.H. for 28 seconds before deploying the pepper spray (<u>see</u> Ex. 45, from 2:21 to 2:49).  During that time, he twice told J.H. to "get on the ground" and told her to "Stop!" five times.  (<u>See</u> Ex. "B" at 3.)  On two of those occasions, he supplemented his "Stop" command as follows: (1) "Stop or you're going to get punched in the face" (coupled with a physical display that he was preparing to do just that, though he never did punch her); and (2) "Stop, turn around!" (<u>Id.</u>)

   While telling J.H. to "get on the ground," defendant used both hands (left hand on the back of her neck and his right hand on the right side of J.H.'s mid-back) to force J.H. to stay on the ground. (<u>See</u> Ex. 45, at 2:23.)  When defendant moved his right hand from J.H.'s back to grab her right wrist (in an apparent effort to gain control of it for the application of handcuffs), J.H. resisted those efforts by moving her torso and head upward and to the right to face and argue with defendant.  (Ex. 45, at 2:24.)  That prompted defendant to once again use both hands (left on the back of her neck

and the right on the back or her right shoulder) to force J.H. back to the ground and facing away from him while demanding that she "Stop!" (Ex. 45, at 2:26.)  When defendant moved his left hand to grab J.H.'s right wrist, J.H. twisted again to her right and toward defendant while gesturing with her left arm and hand.  (Ex. 45, at 2:30.)  After J.H. continues to resist and defendant advises dispatch that he's in a "fight" (Ex. 45, at 2:41), defendant, while holding J.H.'s right wrist in his left arm, uses his right hand to force her to turn away from him again, while yelling "Stop!"  (Ex. 45, at 2:43.)

After continued resistance by J.H., defendant made a decision to use pepper spray (Ex. 45, at 2:46) and then used pepper spray on J.H. in multiple bursts (Ex. 45, at 2:49-2:51), the first of which appears to hit J.H. in the scalp area on the back and right side of her head (Ex. 45, at 2:50) and a later burst more squarely in her face (Ex. 45, at 2:51).

With that, J.H. became more compliant, although she continued with mild physical resistance (e.g., never rolling over, face down and otherwise resisting handcuffing) and verbal protests about defendant's conduct and demands that someone call the LASD "[Watch] Commander." (See Ex. 45, at 2:45-3:37.)  Defendant demanded of J.H., "Hands behind your back!  Put your hands behind your back!" (Ex. 45, at 2:57.)  Defendant was then able to cuff J.H.'s right wrist.  (Ex. 45, at 3:18.)  Defendant then twice demanded that J.H. give him her left hand.  (Ex. 45, at 3:19 and 3:25.)  When J.H. said she couldn't do that out of concern about her eyeglasses, defendant warned that, "You're gonna get sprayed again."  (Ex. 45, at 3:28.)  After nine more seconds, defendant was then able to cuff J.H.'s left hand.  (Ex.

45, at 3:37.)  In contrast to other excessive-force cases, defendant did not use pepper spray after J.H. was cuffed or otherwise secured.

Based on these facts, the evidence does not establish by a preponderance of the evidence that defendant used pepper spray against J.H. with the intent (in whole or in part) to cause bodily injury to J.H.  He used the pepper spray after verbal commands and physical control efforts failed.  Consistent with that intent, he threatened to spray her again <u>if</u> she did not allow him to cuff her left hand.  While placing J.H. in the back of a patrol car, defendant responded to J.H.'s continued protests by saying, "All you had to do was listen."  When J.H. opined that defendant was "mad" because she was videoing him, defendant explained that, "No, I'm mad because you're not listening."  Accordingly, the Government objects to PSR ¶ 50's finding that he did acted with that intent to cause bodily injury.[4]

---

[4]  Whether pepper spray constitutes a "dangerous weapon" has been the subject of litigation over the years.  In <u>United States v. Neill</u>, 166 F.3d 943, 949 (9th Cir 1999), the Ninth Circuit concluded, in a bank robbery case, that the district court did not clearly err in determining that mace constituted a "dangerous weapon" because the victim suffered serious bodily injury when evidence proved pepper spray is capable of causing "extreme pain" and victim testified she felt like she was on "fire."  However, <u>Neill</u> acknowledged that the issue of whether pepper spray constitutes a "dangerous weapon" has met "with mixed results" in other courts.  <u>Id.</u> at 949 (citing <u>United States v. Harris</u>, 44 F.3d 1206, 1216 (3rd Cir. 1995) (overruling "dangerous weapon" enhancement in bank robbery case because the government failed to meet its burden of proving that the defendant "used an 'instrument capable of inflicting death or serious bodily injury'")); <u>see also United States v. Perez</u>, 519 Fed. Appx. 525, 528 (11th Cir. 2013) (overruling enhancement because the record did <u>not</u> show the pepper spray in question was "actually capable of inflicting a serious bodily injury"); <u>United States v. Lancaster</u>, 6 F.3d 208, 209-10 (4th Cir. 1993) (recognizing that district court, which determined momentary burning in eyes and cheeks from mace did <u>not</u> constitute significant injury, was in best position to assess facts, and did not clearly err in its determination).

*(footnote cont'd on next page)*

1    <u>Second</u>, the facts in this case do not establish by a

2   preponderance of the evidence that the offense involved "serious

3   bodily injury," and thus does not support a finding that the offense

4   qualifies under the second prong of the definition of "aggravated

5   assault."  In contrast to the minimal showing needed to prove a

6   "bodily injury," "<u>serious</u> bodily injury" means an "injury involving

7   <u>extreme</u> physical pain or the <u>protracted impairment</u> of a function of a

8   bodily member, organ, or mental faculty; or requiring medical

9   intervention <u>such as surgery, hospitalization, or physical</u>

10  <u>rehabilitation</u>."  <u>See</u> USSG § 1B1.1, Application Notes 1(B) and 1(M).

11       In this case, the testimony of treating physician Dr. Nicole

12  Wojtal, and other evidence indicated that J.H. sustained bruising

13  (<u>i.e.</u>, contusions) and abrasions to her scalp, right wrist, and right

14  arm.  (<u>See</u> <u>generally</u> CR 59 at 87-96; <u>see also</u> Ex. "A" hereto.)  She

15  also had chemical conjunctivitis and contact dermatitis as a result

16  of the pepper spray to her face and head.  Although these injuries

17  may have involved some pain and discomfort, they are temporary in

18  _____

19       Since <u>Neill</u>, the Ninth Circuit has held that unnecessarily
    spraying a <u>person</u> in the face with pepper spray can constitute

20  excessive-force, as well as allowing a handcuffed person to have the
    spray on their face without promptly washing it off (as happened

21  here).  <u>See</u> <u>Headwaters Forest Defense v. County of Humboldt</u>, 240 F.3d
    1185, 1200 (9th Cir. 2001), <u>vacated on other grounds</u>, 122 S.Ct. 24

22  (2001).  But after noting <u>Neill</u>'s holding that "the use of pepper
    spray by a defendant <u>during the commission of a felony</u> may constitute

23  use of a 'dangerous weapon,'" as defined in USSG § 1B1.1, cmt.
    n.1(d),(j), the <u>Headwaters</u> court noted some misgivings about whether

24  that would be true in a police excessive-force case because:
    "Admittedly, police use of pepper spray as a tactical tool to effect

25  arrest <u>is distinguishable</u> from its use by a felon during the
    commission of a robbery."  <u>Id.</u>  <u>See also</u> See J. Cohen, <u>Law</u>

26  <u>Enforcement Use of Less-than-Lethal Weapons: Considerations for</u>
    <u>Congress</u> (2025), https://www.congress.gov/crs-product/R48365

27  ("[O]leoresin capsicum ("OC") spray … generally does not require
    medical attention for those sprayed." (citing A. Cordner and G.

28  Cordner, <u>Overview of Law Enforcement Technology</u>, Criminal Justice
    Technology in the 21st Century, at 42 (3rd ed. 2017)).

nature and did not involve "extreme" pain or "protracted impairment"
of a bodily organ.  As to the pepper spray, for example, when
Dr. Wojtal was asked if pepper spray is painful when applied to the
face, she testified blandly that, "Yes, it's uncomfortable."  (CR 59
at 88, 93.)  These injuries do not constitute <u>serious</u> bodily
injuries.  Indeed, Dr. Wojtal's summary report notes that J.H.
complained only of "<u>mild</u> residual burning and pain of her face at the
site of the pepper spray."  (<u>See</u> Ex. "A" hereto.)

There was also an allegation and evidence relating to a reported
"blunt head injury," but that remained vague and ill-defined even at
trial.  The only evidence of any head injury was J.H.'s self-report
and a bruise/contusion observed on the scalp.  (CR 59 at 87, 92.)  It
is not clear where the bruise was located or, even after studying the
video evidence, how it occurred.  According to the medical summary,
J.H. told medical staff that "she was involved in a use of force
during [which] she was pepper sprayed, <u>pushed to the ground, hitting
her posterior head and right upper extremity</u>."  (<u>Id.</u> at 87; see also
Ex. "A" hereto.)  The problem with this is that defendant's BWC video
<u>does not</u> show J.H.'s head hitting the ground when he forcibly threw
her to the ground (it was cushioned by landing on her left should and
upper arm), and she <u>fell on her left side, not her right</u>.  (<u>See</u> Ex.
45, at 2:19.)  The bruise reportedly observed on her scalp may have
been done to defendant pushing her against the ground after she was
already down or, perhaps, from the pepper spray that hit her in the
scalp on the back, right side of her head.  (<u>See</u> Ex. 45, at 2:50.)
In any event, Dr. Wojtal's report says that J.H. had "no loss of
consciousness," and no CT scan was needed to assess the head injury.

1   (See Ex. "A"; CR 59 at 95.)  Accordingly, whatever what may be said

2   of the injury, it does not constitute a "serious bodily injury."

3       Finally, there was evidence at trial that J.H. sustained an

4   injury to her wrist during her altercation with defendant.  Oddly,

5   the Government did not allege a wrist injury in the indictment

6   (opting instead to vaguely allege "other physical injuries"), and we

7   hedged at trial when describing it in our opening statement only as a

8   "potential fracture of her wrist."  (CR 58 at 12, lines 3-4.)  On

9   direct exam, the Government also approached the injury in a gingerly

10  manner.  (CR 59 at 89.)  When asking about J.H.'s report of pain in

11  her right wrist (in an area called the "snuffbox"), the Government

12  asked Dr. Wojtal if "pain in the snuffbox area raise[s] any potential

13  concerns for you as a treating physician?"  (CR 509 at 89.)  Dr.

14  Wojtal said, "Yes, … pain there can mean a fracture."  (Id.)

15  Moreover. Dr. Wojtal testified that an x-ray of J.H.'s was negative

16  for any fracture, and that she splinted J.H.'s wrist per the standard

17  of care that counsel in favor of caution and assuming a potential

18  fracture actually occurred, and that is the treatment she would

19  provide for "everyone who complained of that kind of pain."  (CR 59

20  at 89-90, 95-96.)  Bottom line: The Government failed to prove an

21  actual fracture of J.H.'s scaphoid bone.

22      J.H. did report suffering pain in her right forearm and wrist,

23  but Dr. Wojtal's summary report notes that J.H.'s complaints as to

24  that injury "mild swelling and pain" with decreased range of motion.

25  (Ex. "A.")  Dr. Wojtal also noted that J.H. had "no numbness or

26  tingling distal to the injury."  (Id.)  Overall, based on J.H.'s

27  report, Dr. Wojtal noted that "[p]ain is described as moderate in

28  nature."  (Id.)  Accordingly, based on the evidence at trial, the

13

injury to J.H.'s wrist and arm do not constitute "serious" bodily injuries.

For all of the foregoing reasons, § 2A2.2's "aggravated assault" guideline is inapplicable, and the Base Offense Level is 10 under § 2H1.1(a)(3).

### C.    The Obstruction of Justice Enhancement Is Improper

In the indictment, the Government alleged that defendant prepared and submitted a "misleading" supplemental police report that contained "misleading[]" claims, but we eschewed use of the word "false" when describing the falsity of those claims and never charged defendant with a violation of 18 U.S.C. § 1591 (Falsification of Records).  (CR 1 at 3-4.)  In a memo to the USPO, dated March 26, 2025, the Government alerted the USPO to those "misleading" statements, but we advised that the Government was "not currently planning to seek a two-level upward adjustment under USSG § 3C1.1 for this misleading conduct."  (USAO Memo at 6, n.3.)

In the PSR, the USPO determined that the statements made in defendant's supplemental police report were materially false and designed to obstruct the investigation of his own misconduct and any prosecution.  Based on those conclusions, the USPO applied a two-level enhancement for obstruction of justice under USSG § 3C1.1. (See PSR ¶¶ 58-60.)  Based on our review of the video evidence, the Government respectfully disagrees and objects to PSR ¶¶ 58-60.

First, defendant's report is not clearly false or misleading when he says that J.H. attempted to hit him and that she turned and took a "blading" or "fighting stance."  The video recordings show that as defendant approached her, J.H. brought her right hand out from behind her back and swatted away defendant's left arm as he

14

reached out to grab her left hand, and J.H. stepped back in a

"bladed" stance.  Oddly enough, both the indictment (CR 1, ¶ 8, at 2)

and PSR ¶ 21 both say that J.H. turned away from defendant at that

time.  So, the PSR is internally inconsistent in saying defendant's

report on that point is false.

     J.H. does not appear intent on striking a violent blow against

defendant, but it bears noting that a 911 caller reported that J.H.

was "assaulting" Winco store employees and "spitting in their faces";

the dispatcher's CAD texts said the suspects were "fighting Loss

Prevention" employees (Ex. 121); and Winco's interior surveillance

footage shows that J.H., in fact, assaulted a Winco store employee

minutes before, when she lowered her face mask and spat directly into

the employee's face from a few inches away.

     In any event, here's what the video evidence shows of J.H.'s

conduct as defendant approached her:



Here, J.H. has her right arm down, standing square to defendant:

 

And then, J.H. raises her right arm, brings her left arm down and back, and steps back while turning to her left:

 

And, here's the swatting movement with her right arm:

 

16

And, these photos show the completed swatting movement, with a full "blading" turn:

  

 

PSR ¶ 59 is also wrong in finding that defendant's report falsely stated that he used his left foot/leg to sweep J.H.'s legs while conducting a take-down.  (See PSR ¶¶ 58-59.)  It may not be a classic move that they'll teach for decades at the Academy, but the video shows defendant used his left leg to pin or block (or is it "sweep"?) J.H.'s leg while forcing her to the ground.  Again, let's roll the tape . . . .  And there it is:



Even if the statement about the use of his leg was a total falsehood, it still would not warrant an obstruction-of-justice enhancement because it was <u>not</u> "material" and did not "significantly obstruct" the investigation or prosecution. <u>See</u> USSG § 3C1.1, comment. n.4(G), n.6. The key fact, which defendant admitted in his report, is that he threw J.H. to the ground.

And, finally, PSR ¶ 58 is wrong in finding that defendant made a knowing and intentional false statement in his report when he wrote that he attempted to spray J.H.'s eyes with the pepper spray, but she turned her face away and thus required another burst of pepper spray to hit her face. Contrary to PSR ¶ 59, the BWC video does not clearly show that the first burst of pepper spray hit J.H. directly in the face, as defendant intended. What the BWC video does clearly show, however, is that J.H. turned her head away at some point, and the first deployment of pepper spray hit her in the back and right side of her head, as shown in these screenshots from Ex. 45, at 2:50. As he admits, defendant then tried again and sprayed the pepper spray more directly into J.H.'s face.

 

1

**RESTITUTION**

2     Upon the submission of sufficient evidence or a stipulation of
3 the parties, the law authorizes the Court to order the payment
4 restitution for specified losses (<u>e.g.</u>, an amount equal to the cost
5 of necessary medical and related professional services relating to
6 necessary physical, psychiatric, psychological, and rehabilitative
7 care resulting from the offense and lost income resulting from the
8 offense). <u>See</u> 18 U.S.C. § 3663A(b)(2). However, where the victim
9 has received compensation from insurance or another source with
10 respect to such losses, the restitution order should require
11 defendant to pay the entities that provided or were obligated to
12 provide such compensation. <u>See</u> 18 U.S.C. § 3664(j)(1).

13     As noted in the PSR, however, "[t]he Probation Officer and the
14 AUSA have submitted requests for a victim impact statement and/or
15 demand for restitution to J.H.'s legal counsel which have yet to
16 yield any information." (PSR ¶ 36; <u>see also</u> PSR ¶ 141.)
17 Accordingly, the Government has no basis for recommending any amount
18 of restitution at this time or to advise whether the payments should
19 be made to J.H. or an insurer, employer, or other third-party payor.

20

**CRIME VICTIMS' RIGHTS ACT**

21     The Government has advised J.H.'s attorney, Caree Harper, Esq.,
22 of the upcoming plea and sentencing hearing. Prior to entering the
23 Post-Trial Agreement, the Government also contacted J.H.'s attorney
24 to advise her of the terms of the contemplated agreement and heard
25 and considered the attorney's objections to it.

26     However, earlier today, a person who identified herself as J.H.
27 called another AUSA, who was previously involved in this case. J.H.
28 said that Ms. Harper has not been in contact with her, and J.H. was

seeking information about the case.  The Government attorney told

J.H. about the upcoming hearing.  J.H. said she wanted to speak with

a Victim/Witness person, and the Government's attorney provided her

with contact information for an FBI Supervisory Special Agent, who

could put her in touch with FBI's Victim/Witness Unit.

The Crime Victims' Rights Act affords victims the right to be

heard at any hearing involving a plea or sentencing of the defendant.

See 18 U.S.C. § 3771(a)(4).  The Government does not yet know if J.H.

will be in attendance at the hearing.  If she does attend the

hearing, J.H. has the right to personally address the Court regarding

both the plea and sentencing.


DATED: May 13 2025.                    BILAL A. ESSAYLI
                                       United States Attorney


                                           /s/ R.J.K.
                                       _____
                                       ROBERT J. KEENAN
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**Exhibit "A"**

J.H. Medical Record Excerpts

**Diagnosis:**

   1:Blunt head injury; 2:Scalp contusion; 3:Contusion of right forearm; 4:Contusion of right wrist; 5:Chemical conjunctivitis; 6:Contact dermatitis; 7:Closed
fracture of scaphoid of right wrist

## **Diagnosis/Assessment/Plan**
1. Blunt head injury

2. Scalp contusion
3. Contusion of right forearm
4. Contusion of right wrist
5. Chemical conjunctivitis
6. Contact dermatitis
7. Closed fracture of scaphoid of right wrist

### **Contusion**

A contusion is a deep bruise. Contusions are the result of a blunt injury to tissues and muscle fibers under the skin.
The injury causes bleeding under the skin. The skin overlying the contusion may turn blue, purple, or yellow. Minor
injuries will give you a painless contusion, but more severe injuries cause contusions that may stay painful and
swollen for a few weeks.

### **Documentation**
**HPI:** This is a 58-year-old female with a history of asthma, cancer and recent left eye
reconstruction surgery presenting with an injury to the right wrist and forearm that
occurred just prior to arrival.  Patient was originally brought in by law enforcement as an
ok to book but was released from custody prior to evaluation.  Patient states she was
involved in a use of force during which she was pepper sprayed, pushed to the ground
hitting her posterior head and right upper extremity.  There is no loss of consciousness.
Does not take a blood thinner.  Patient complains of mild swelling and pain of her right
forearm and wrist with decrease range of motion secondary to pain.  There is no
numbness or tingling distal to the injury.  Additionally, patient states she was pepper
sprayed; face/eyes were cleaned with Sudecon wipes and patient complains of mild
residual burning and pain of her face at the site of the pepper spray.  There is no
associated dental pain, back pain, neck pain, abdominal pain, visual disturbances.  No
recent illness
Pain is described as moderate in nature and are exacerbated by movement and palpation.

Exhibit "B"

<u>**EXHIBIT 5A – TRANSCRIPT OF DEFENDANT'S BWC VIDEO**</u>
**(MODIFIED TO INCLUDE TIME-MARKS & KEY ACTIONS)**

Defendant: Come here!

Mr. Barnes: It was something crazy!

Alejandre: What's going on?

Mr. Barnes: Look at the camera, bro. He come [unaudible] some shit, right.

Alejandre : Alright, relax!

Defendant: We're just going to pat you down, bud, big dog.

Mr. Barnes: I don't have nothin!

Alejandre: They said there's weapons.

Defendant: Okay, relax, we don't know that.

Mr. Barnes: Man, I don't have nothin'. . .

Alejandre: Okay we're just going to pat you down.

Mr. Barnes: . . . but a pack of cigarettes. See there goes this . . . Now what?

Defendant: Just relax!

Mr. Barnes: I'm not even being resistant!

Alejandre: ==That's the wife over there==.

Mr. Barnes: Huh?

Defendant: ==Alright, dude== . . .

Mr. Barnes: Wait, wait, wait, naw, man, I'm not, wait, wait, no, I'm not under arrest for what?

Defendant: ==You're not under arrest, you're being detained.==

==Alejandre: Detained.==

Mr. Barnes: But why you… detained for what? For what!?

Exhibit "B" at 1

```
 1
 2   Alejandre: Dude, listen!
 3
 4   Defendant: Calm down!
 5
 6   Mr. Barnes: What have I done?
 7
 8   Defendant: Stop, dude.
 9
10   Mr. Barnes: I haven't stole [inaudible] cake.
11
12   Defendant: Stop.
13
14   Mr. Barnes: Man, I can bust loose, man. Why y'all doin' this shit,
15   man? Boss, why y'all doin, all this?
16
17   Defendant: Dude, relax, or you're going to get put down.
18
19   Ms. Houseton: By law, you have to tell him the reason you detaining
20   him.
21
22   Mr. Barnes: That man was threatening me, man.
23
24   Ms. Houseton: By law, you have to . . . You see this?  Yea, it's
25   on YouTube.
26
27   Mr. Barnes: Man, my wife's a paralegal. Ow! My arm is fucked up,
28   man!
29
30   Ms. Houseton: It's on YouTube Live.
31
32   Mr. Barnes: My arm is fucked up man!
33
34   Defendant: Where's the wife?
35
36   Alejandre: Over there.
37
38   Mr. Barnes: I'm telling you there's [inaudible] on my arm.
39
40          [Defendant approaches and reaches out toward J.H.]
41                  [Ex. 45, Time Stamp: 2:13.]
42
43   Ms. Houseton: No! You can't touch me!
44
45   Defendant: Stop!
46
47   Ms. Houseton: You can't touch me!
```

Exhibit "B" at 2

Defendant: Stop!

            **[J.H. forced to ground.  Ex. 45, Time-Mark: 2:18.]**

Ms. Houseton: Ahhhhh!

                        **[Ex. 45, Time-Mark: 2:20.]**

Defendant: Get down on the ground!  **[Time: 2:21]**

Ms. Houseton: What are you doing?

Defendant: Get on the ground!  **[Time: 2:23]**

Ms. Houseton: It's already on YouTube Live.

Defendant: Stop, I don't give a . . . Stop!  **[Time: 2:26]**

Ms. Houseton: Mother fucker, stop!  Stop!

Defendant: Stop or you're going to get punched in the face.  **[Time: 2:29]**

Ms. Houseton: You punch me and you gonna, you gonna get sued too! You already got sued! I got you on camera!

Defendant: [Inaudible].

Mr. Barnes: She's got cancer, man!

Defendant: Stop, turn around!  **[Time: 2:37]**

Ms. Houseton: I got it on camera.  Get your neck off my, off my, I can't breathe!

Defendant [to Dispatcher]: Hey, we're in a fight at the WinCo **[Time: 2:41]**

Ms. Houseton: I can't breathe!  There's no fight!

Defendant: Stop!  **[Time: 2:43]**

Ms. Houseton: You threw me down to the ground!  Stop man handling me!  I didn't do nothin'!  **[Defendant Deploys Pepper Spray; Ex. 45, Time-Mark: 2:49.]**  You threw me down!  Call the commander!

Mr. Barnes: [Inaudible] . . . my sister!

Ms. Houseton: Call the commander!

Mr. Barnes: Come on, man!

Defendant: Hands behind your back!  **[Time: 2:57]**

Ms. Houseton: Call the commander! Stop twisting my arm!

Defendant: Put your hands behind your back!  **[Time: 3:01]**

Ms. Houseton: I can't!

Mr. Barnes: She got cancer, big bro!  Man, don't do her like that, man.

Ms. Houseton: Call the commander.

Alejandre: Calm down, man.

Mr. Barnes: Nah, I ain't doin' nothing.

Ms. Houseton: I'm requesting the commander.

Defendant: Stop!  **[Time: 3:11]**

Ms. Houseton: I'm not doing anything! Call the commander! Call the commander.

Defendant: Give me your hand.  Give me your hand!  **[Time: 3:19]**

Ms. Houseton: Call the commander.  I got my prescription glasses.

Defendant: I don't care.

Ms. Houseton: I just got eye surgery.

Defendant: Put your hand behind your back!  **[Time: 3:25]**

Ms. Houseton: Wait a minute! Let me get my . . .

Defendant: You're gonna get sprayed again.  **[Time: 3:28]**

Ms. Houseton: . . . glasses out my hand.

Alejandre: You got her?

Mr. Barnes: Damn, man, baby, you alright?

Ms. Houseton: No.

Defendant: Let me get a 902r [inaudible].

Ms. Houseton: He threw me to the ground . . .

Mr. Barnes: Aye, bro, she got cancer, bro.

Ms. Houseton: He put his knee in my . . .

Defendant: Get up!

Ms. Houseton: I can't, I can't see anything. Why are you man handling me?

Defendant: Because you're, you're being detained.

Ms. Houseton: No, I didn't do nothing. Now you're mad because I put it on YouTube live. And they seen everything!

Defendant: Let's go!

Ms. Houseton: That's why you're mad.

Defendant: Let's go! Stop fighting!

Ms. Houseton: I'm not fighting! I can't see where I'm going!

Mr. Barnes: Jacy . . . just . . .

Exhibit "B" at 5

1

<u>**CERTIFICATE OF SERVICE**</u>

2

3     I am a citizen of the United States and a resident of Orange
County, California.  I am over 18 years of age, and I am not a party
to the above-entitled action.  My business address is the United
States Attorney's Office, Ronald Reagan Federal Building and United
States Courthouse, 411 West Fourth Street, Suite 8000, Santa Ana,
California 92701.

4

5

6     On this date, **May 13, 2025,** I served a copy of the attached
document, **GOVERNMENT'S POSITION STATEMENT IN RESPONSE TO PRE-SENTENCE
REPORT RE. DEFENDANT TREVOR JAMES KIRK,** on the defendant's attorneys
of record <u>and</u> the assigned U.S. Probation Officer by e-mailing it to
the following e-mail address:

7

8

9            **Edward M. Robinson** ---  **eroblaw@gmail.com**
            **Brian A. Robinson**  ---  **broblaw11@gmail.com**
            **Tom Yu**              ---  **TYu@TomYuLaw.com**

10

11            **Shani_Kochav@cacp.uscourts.gov**

12

13     I declare under penalty of perjury that the foregoing is true
and correct.  This declaration is executed on this day, **May 13, 2025,**
at Santa Ana, California.

14

15

16                          _____
                              /s/ R.J.K.
17                            Robert J. Keenan

18

19

20

21

22

23

24

25

26

27

28